***********
Based upon review of all of the competent evidence of record with references to the errors assigned and finding no good grounds to reconsider the evidence, receive further evidence, rehear the parties or their representatives, the Full Commission AFFIRMS the Opinion and Award of the Deputy Commissioner.
 ***********
Based upon all of the competent evidence of record the Full Commission makes the following:
 FINDINGS OF FACT
1. The parties are subject to and bound by the North Carolina Workers' Compensation Act.
2. Defendant is the North Carolina Department of Correction and the employee is Elaine Jackson.
3. At all relevant times, defendant was a qualified self-insured.
4. The third-party administrator is Key Risk Management Services.
5. Plaintiff sustained an injury by accident arising out of and during the course of her employment with defendant on January 16, 1999.
6. Defendant accepted liability for the original claim by filing a Form 60, but denied liability for compensation and medical benefits between April 27, 1999 and October 2, 2000.
7. The parties stipulated to the admissibility of plaintiff's medical records (Stipulated Exhibit #1) and employment records and Industrial Commission forms related to plaintiff's case (Stipulated Exhibit #2).
8. In lieu of depositions, the parties were allowed to send interrogatories to treating doctors and the doctor's responses were entered into the record. Responses were received from Dr. Scott Sanitate only. The other two treating physicians have offices located in Florida and would not tender answers absent the payment of fees.
9. Plaintiff was working as a correctional officer on January 16, 1999 in Unit One, B Block Control Station at Central Prison in Raleigh when she sustained an injury by accident arising out of and during the course of her employment with defendant. As she descended a stairwell in Unit One, plaintiff slipped on the third step from the bottom of the staircase and fell. Plaintiff felt pain in her neck, shoulder, left wrist and right hip. There were no witnesses to the injury.
10. Defendant accepted this claim as compensable and directed plaintiff's medical treatment. According to the Form 22, included in Stipulated Exhibit #2, plaintiff's average weekly wage was $559.61, yielding a compensation rate of $373.09.
11. After plaintiff fell, she informed her superiors and went to the prison hospital for evaluation. Medical staff evaluated plaintiff and did not observe any visible injuries, redness or swelling and referred her to Garner Urgent Care Center. Dr. Parikh at Urgent Care treated plaintiff, who complained of neck, shoulder and right hip pain.
12. According to medical records, Dr. Parikh examined plaintiff and evaluated her condition and ordered X-rays of plaintiff's cervical spine, shoulder and right hip. On January 16, 1999, Dr. Parikh returned plaintiff to light duty, sedentary work, with a ten-pound lifting restriction. Plaintiff was asked to return to the clinic for follow-up on January 20, 1999. Plaintiff was not satisfied with her medical treatment, stayed out of work for several days and sought treatment from her family physician, Dr. Jennifer Wilkins of Zebulon, who was not an authorized medical provider. Dr. Wilkins evaluated plaintiff and prescribed light duty work as well.
13. Defendant's insurance adjuster, Becky Joseph of Key Risk Management Services, testified at the hearing before the Deputy Commissioner that she scheduled an appointment for plaintiff to see Dr. Scott Sanitate, of Carolina Back Institute (formerly with Spectrum Physical Medicine, in Raleigh). Dr. Sanitate is an authorized workers' compensation medical provider and specialist in back injuries. He is board certified in rehabilitation and electrodiagnostic medicine.
14. Plaintiff stayed out of work approximately three days then returned to work on light duty. Prior to the injury, plaintiff's regular duty assignment was in Unit One, B Block Control Station. One of the physical requirements of this job required plaintiff to climb two flights of stairs at least once an hour to check on inmates. After plaintiff was released to light duty work, plaintiff was assigned to light-duty patrol work in K Dorm, which included no stair climbing and monitoring inmates during the overnight hours of third shift.
15. According to Associate Warden Sherwood McCabe, it was standard procedure at Central Prison to assign officers to light duty positions based on doctor's notes. Central's light duty policy required defendant to make reasonable accommodations to temporarily injured employees and put them on light duty during their period of recovery, usually on third shift. The designated light duty stations included the operations control stations, which were enclosed booths where the officer could alternate between sitting and standing and would not be exposed to inmate contact and no stair climbing was required. Another light duty position included K Dorm patrol where plaintiff was assigned. This position involved the officer monitoring inmates on one floor during the overnight hours, when there was little activity. Plaintiff was given this light duty position.
16. Dr. Sanitate first evaluated plaintiff on February 8, 1999 and saw her for follow-up visits on February 22, March 11 and March 25, 1999. Dr. Sanitate prescribed Ultram and Celebrex and reviewed Dr. Parikh's notes from Urgent Care, which were provided to him by Key Risk Management Services, along with plaintiff's previous MRI results. X-rays were not available for his review.
17. According to Dr. Sanitate's medical notes from February 8, 1999, he took a medical history and examined plaintiff, who complained of mid-paracervical pain and pain between her shoulder blades. Dr. Sanitate diagnosed plaintiff with cervical facet syndrome and felt she did not have C8 radiculopathy. He returned plaintiff to work, light duty in a "booth" position for two weeks and gave her samples of Ultram with a refill prescription. As described to him by plaintiff, Dr. Sanitate understood light duty to mean that plaintiff would be responsible for monitoring about 100 inmates in a dormitory setting. Dr. Sanitate asked plaintiff to return for a follow-up in two weeks and to call if her symptoms worsened.
18. Plaintiff was seen again by Dr. Sanitate on February 22, 1999 at which time plaintiff's main complaints involved hip pain while walking at work and fluctuating left-side paracervical pain. Dr. Sanitate performed basic clinical tests and diagnosed plaintiff with left cervical syndrome, prescribed Celebrex and told plaintiff to continue with light duty work in the dormitory for two more weeks and to call the office if symptoms worsened.
19. On March 4, 1999, Dr. Sanitate released plaintiff back to regular duty work, stating that she "[m]ay return to regular duty. If present position available full time permanent this would be acceptable." This statement was repeated in Dr. Sanitate's March 11, 1999, office note. And Dr. Sanitate reaffirmed this statement in his answers to the Interrogatories, where he said, "Ms. Jackson's light duty restrictions in the dormitory were continued until March 11, 1999, when she was returned to regular duty."
20. As indicated by Dr. Sanitate' office note of March 11, 1999, he understood that plaintiff's light duty position at work did not include stair climbing and that he was returning plaintiff to a "regular" position that included stair climbing in her previous position, Unit One. Plaintiff followed up with Dr. Sanitate on March 25, 1999, and according to Dr. Sanitate's answers to interrogatories, she reported overall improvement in her cervical pain, benefiting from the prescribed Celebrex. As of her last visit, plaintiff was still having right buttock pain. Plaintiff was instructed to follow up with Dr. Sanitate in three weeks.
21. In his Interrogatory answers, Dr. Sanitate reaffirmed his return of plaintiff to regular duty by stating, "It is my opinion that she [plaintiff] was physically able to return to regular duty on March 11, 1999." He went on to say that plaintiff was still having right buttock pain, gluteal in nature, but was having "overall improvement in cervical pain. Benefit with Celebrex." Dr. Sanitate removed all of plaintiff's restrictions and did not give plaintiff a permanent partial disability rating.
22. During each of plaintiff's office visits, Dr. Sanitate noted that plaintiff was complaining about a harassment law suit she filed against defendant in another matter and the lawsuit was causing plaintiff stress in her employment.
23. On March 11, 1999 after plaintiff was released, Mr. McCabe informed plaintiff that she was being reassigned the next day back to her regular job in Unit One. According to plaintiff's time sheets and testimony from the parties, plaintiff returned to work several days after her injury. She worked approximately nine days in January, 11 days in February, 18 days in March and three days in April. The remainder of the days were accounted for through vacation, sick and earned leave. Plaintiff's last day at work for defendant was April 2, 1999.
24. On April 14, 1999, plaintiff's psychologist, Ronald J. Valentine, Ph.D., recommended that plaintiff stay out of work for at least one month due to work-related stress. Dr. Valentine did not relate plaintiff's stress to her workers' compensation injury or any pain she may have been experiencing as a result thereof.
25. Plaintiff resigned April 27, 1999 through a hand written letter to Mrs. Hobbs, Central Prison Administration. Plaintiff stated "due to circumstances beyond my control i.e.; physical and emotional inability to continue working in Unit 1 third shift, I am hereby tendering my resignation as correctional officer at Central Prison, Raleigh N.C." Plaintiff further stated in her letter of resignation, that her resignation would take effect upon receipt of her letter.
26. Plaintiff later moved to Florida in July 1999 to be with family. Ms. Joseph testified at hearing that she did not hear from plaintiff until August 17, 1999, when plaintiff called Ms. Joseph from Florida complaining of renewed back, hip, neck and wrist pain.
27. After arriving in Florida, plaintiff applied for and began receiving unemployment benefits from the state.
28. On September 17, 1999, defendant authorized plaintiff to see Dr. Homi Cooper, of Atlantic Orthopaedic Group, Melbourne, Florida, for an evaluation only. Dr. Cooper performed an examination of plaintiff. Among other things, he stated that "[o]ne sees a person in no acute distress . . . she ambulates well. She can walk well on her heels and her toes." Dr. Cooper ordered a cervical spine MRI, EMG and nerve conduction studies of the upper extremities and defendant authorized payment of these tests. Dr. Cooper allowed plaintiff to return to work with restrictions of no heavy lifting, nothing greater than 20 to 30 pounds, no prolonged walking and no forceful pushing or pulling. Although defendant authorized plaintiff to see Dr. Cooper for an evaluation only, plaintiff continued treating with him.
29. Although the MRI results indicated that plaintiff had a herniated disc at C6-7, Dr. Cooper was still of the opinion that plaintiff could perform light duty work, as indicated by his November 15, 1999, return to work note. This note contained the identical work restrictions as the September 17, 1999, note. On January 4, 2000, Dr. Cooper repeated the same work restrictions, even after plaintiff's lumbar MRI showed a bulging disc at L4-5 on November 29, 1999. Dr. Cooper's office notes on January 4, 2000 state: "The patient states that she cannot work within her limitations and feels that she is totally disabled. I have explained to her that she has some limitations, but not total disability."
30. On February 8, 2000, plaintiff was seen for a second opinion by Dr. Paul M. Keller. Dr. Keller felt that plaintiff was not a surgical candidate and recommended conservative therapies, such as steroid injections. Dr. Keller prescribed Celebrex and Skelaxin.
31. Plaintiff continued to get various treatments from Florida health care providers. Defendant approved payment of those treatments it deemed causally related to plaintiff's workers' compensation injury. For example, defendant did not approve payments for treatment of plaintiff's carpal tunnel condition. These treatments included pain blocks and steroid injections.
32. On May 24, 2000, Dr. Cooper again reiterated his previous light duty work restrictions: plaintiff could return to work with no heavy lifting, nothing greater than 20 to 30 pounds, no prolonged walking and no forceful pushing or pulling.
33. On June 7, 2000, plaintiff was seen by Dr. Jonathan T. Paine, a neurosurgeon, in Melbourne, Florida. Dr. Paine ordered another lumbar MRI and EMG of the upper extremities. The MRI showed no lumbar disc herniation. Dr. Paine told plaintiff that she had three levels of cervical disc disease and it "is difficult to determine the etiology of her pain . . ."
34. A Form 28U, Employee's Request That Compensation be Reinstated After Unsuccessful Trial Return To Work, was filed on July 18, 2000. The form was signed by Dr. Paine, who was not an authorized treating physician.
35. A cervical MRI on August 6, 2000, indicated that plaintiff had a cervical disc herniation at C6-7 and Dr. Paine scheduled plaintiff for surgery after her September 29, 2000 appointment.
36. On October 2, 2000, Dr. Paine performed discectomy, fusion and bone graft surgery on plaintiff at C4-C7. Plaintiff's diagnosis included cervical spondylosis at C4-C5, C5-C6, with radiculopathy and a right sided herniated cervical disc at C6-7. Plaintiff was taken out of work for a period of time by her doctor and has apparently not worked since leaving employment with defendant in April 1999.
37. Plaintiff filed her Form 18 on August 14, 2000 for the January 16, 1999, injury. Defendant filed a Form 60 on October 16, 2000, admitting employee's right to compensation from her January 16, 1999 injury and agreeing to pay employee temporary total disability at the compensation rate of $373.09.
38. Ms. Joseph testified that defendant accepted liability for this claim, paid all medical bills for plaintiff's treatment in North Carolina and paid for authorized medical procedures in Florida. No temporary total disability benefits were paid to plaintiff until Dr. Paine performed cervical surgery on plaintiff on October 2, 2000 and plaintiff could not work at all. Ms. Joseph testified that it appeared that the cervical surgery was directly related to the January 16, 1999, injury, so she authorized payment of the surgery and payment of temporary total disability compensation from that point forward.
39. Defendant filed two Form 28Bs on March 28, 1999 and August 5, 1999, respectively, indicating plaintiff's return to work date as March 11, 1999, with total medical compensation being $950.93.
40. Defendant was paying temporary total disability benefits to plaintiff and paying for medical expenses for treatment related to her original compensable injury at the time of the hearing before the Deputy Commissioner.
41. On April 17, 2000, plaintiff's prior attorney, John M. McCabe, filed a Form 33 Request for Hearing on behalf of plaintiff, seeking temporary total disability from April 27, 1999 and ongoing, payment of medical expenses/treatment and payment of permanent partial disability.
 ***********
Based upon the foregoing findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Plaintiff sustained an admittedly compensable injury by accident on January 16, 1999 that resulted in an injury to her neck and back. N.C. Gen. Stat. § 97-2(6).
2. Defendant admitted compensability of plaintiff's injury by accident on October 16, 2000 by filing a Form 60. However, the Form 60 does not create a presumption of continuing disability and therefore the burden of proving disability remains with plaintiff. Sims v. Charmes/Arby's RoastBeef, 142 N.C. App. 154, 542 S.E.2d 277 (2001)
3. In order to meet the burden of proving disability, plaintiff must prove that she was incapable of earning pre-injury wages in either the same or in any other employment and that the incapacity to earn pre-injury wages was caused by plaintiff's injury. Hilliard v. ApexCabinet Co., 305 N.C. 593, 290 S.E.2d 682 (1982). In this claim, plaintiff was released to full-duty work without restrictions on March 4, 1999. Plaintiff resigned on April 27, 1999 for reasons unrelated to her disability. Following her resignation, plaintiff was not found to be totally disabled by a physician. Therefore, plaintiff has failed to establish by the greater weight of the medical evidence that as a result of the compensable injury by accident she is incapable of work in any employment after March 4, 1999. N.C. Gen. Stat. §§ 97-2(9); -29;Russell V. Lowes Product Distribution, 108 N.C. App. 762, 425 S.E.2d 454
(1993).
4. Medical treatment of plaintiff's neck and back was necessary to effect a cure, give relief and tended to lessen plaintiff's period of disability. Defendant is responsible for the payment of this treatment. Defendant is not responsible for payments for any medical treatment involving plaintiff's carpal tunnel syndrome. N.C. Gen. Stat. § 97-25.
5. Plaintiff resigned from employment with defendant for reasons unrelated to her original compensable injuries and her resignation is a refusal of suitable employment. N.C. Gen. Stat. § 97-32.
6. Plaintiff failed meet to her burden and prove that she was totally disabled from employment with defendant as a result of her compensable injury between April 27, 1999 to October 2, 2000 and is therefore not entitled to compensation for said time period. N.C. Gen. Stat. §§ 97-2;97-29.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 ORDER
1. Plaintiff's claim for workers' compensation benefits from April 27, 1999, to October 2, 2000, must be and is DENIED.
2. Defendant shall pay for all medical treatment incurred or to be incurred as a result of plaintiff's January 16, 1999 injury by accident for so long as such treatment tends to effect a cure, give relief or tends to lessen plaintiff's period of disability.
3. Defendant shall pay the costs.
This the ___ day of June 2003.
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
 S/_______________ DIANNE C. SELLERS COMMISSIONER
LKM/kjd